**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 3:07-00096 |
| | ) | JUDGE ECHOLS |
| REMETRIUS RAMONE MAINE | ) | |
| | ) | |

## MEMORANDUM

Defendant Remetrius Ramone Maine filed a Motion to Suppress Evidence and Statements (Docket Entry No. 18) to which the Government responded in opposition (Docket Entry No. 19). The Court held an evidentiary hearing on the Motion to Suppress on January 15, 2008. Thereafter Defendant Maine filed a Supplemental Brief In Support Of Motion To Suppress (Docket Entry No. 35) and the Government filed a Supplemental Response of United States In Opposition To Defendant's Motion To Suppress Evidence (Docket Entry No. 36).

## I. FINDINGS OF FACT

Sergeant Dan Whitley has been employed by the Metropolitan Nashville Police Department for seventeen (17) years. In November 2006 he served as sergeant over the daytime flex unit in the patrol division. This unit consists of four or five officers and a sergeant. The unit does not answer dispatcher calls, but acts as a proactive group working in specific areas of Nashville where crimes such as burglaries, robberies, and aggravated assaults are occurring. The officers make stops of vehicles and individuals in high crime areas in an effort to locate "the criminal element." (Suppression Hr'g Tr. at 35.) Increased visibility of police in the areas also helps to deter additional crimes.

The flex unit works hand-in-hand with the Metropolitan Development Housing Agency ("MDHA") to solve and prevent crimes in public housing neighborhoods. Officials at MDHA and the police department share information about problem locations or specific addresses where it is believed that some type of vice activity is occurring.

Although referred to as "public housing," MDHA's properties are actually private property. Apartment buildings in the MDHA public housing areas are posted on all four sides, in the middle of the buildings about eight (8) feet high, with signs that read: "MDHA PROPERTY NO TRESPASSING" and in smaller letters underneath, "VIOLATORS WILL BE PROSECUTED." (Pl. Exs. 3-4.) MDHA has a written criminal trespassing policy (Def. Ex. 2). This policy provides in pertinent part:

> **PURPOSE**: To provide a uniform written policy concerning the criteria to be met for persons to be charged with criminal trespassing on MDHA properties in accordance with *Tennessee Code Annotated* 39-14-405.
>
> A.  MDHA considers any person who enters onto its properties without the authority or permission of management and/or residents as trespassers. MDHA shall cause a verbal or written warning to be issued to any non-resident who enters onto and had no legal right to be on the property of MDHA or is not an invited guest of a resident. MDHA Managers, Security Staff and Metropolitan Police Officers shall issue said warning to non-resident in the performance and/or execution of their official duties. Such warnings shall be issued to non-residents who:
>
> > 1. Engage in or has had a verbal or physical confrontation with law enforcement personnel, residents, guests or housing management staff.
> > 2. Engage in criminal activity on housing authority property in which a deadly weapon was used or threatened to be used.
> > 3. Any person who had been involved in or suspected of being involved in drug related activity that is loitering on MDHA property.
> > 4. Any person engaged in criminal activity on housing authority property which is non-violent in nature and which causes no physical injury to another.
> > 5. Any criminal activity that occurred on agency property that interferes with the quiet and peaceful enjoyment of the property where MDHA employees and residents work and live.
> > 6. Damage property of the Housing Authority.
>
> B.  MDHA has "No Trespassing" signs posted throughout its housing developments/properties and encourages [its] residents to inform their guests to remain in the yard of the dwelling residents they are visiting. Likewise, any person(s) entering on MDHA properties to utilize facilities (i.e., playgrounds, basketball courts, laundry mats, etc) must be a guest and in the physical presence (or company) of a household member who is on the lease of the property visited.

2

C. Any person who has received a warning to leave the property under the provisions of this policy and who returns shall be deemed a trespasser.

The policy includes a form that can be filled out giving the Metropolitan Nashville police department authority to enforce and prosecute trespassing violations. The testimony at the suppression hearing did not address how this form is used in actual practice.

According to Arthur Rees, a former long-time Metropolitan Nashville police officer who is now MDHA's security coordinator, the written policy is a guideline for police and is geared toward someone who is criminally trespassing on MDHA property for the first time, who is not there to visit, who is not a resident, and who is not engaged in any criminal activity. MDHA asks the police department to patrol its property and to verify that persons found on the property have legitimate reasons for being there. On a monthly basis, MDHA provides the police department with a list of persons who signed leases for apartments as well as a list of individuals who are banned from MDHA property because they were arrested on MDHA property in possession of controlled narcotics for resale. MDHA does not keep a list of persons who have been warned to leave MDHA property. If trespassers are found on MDHA property, however, MDHA wants the police to arrest those trespassers immediately. MDHA has never informed police officers that MDHA's criminal trespassing policy means the police cannot investigate someone found on MDHA property just because that person's name is not on the "no trespass" list. MDHA does not want a first-time trespasser on MDHA property who is a felon in possession of a gun or who has outstanding warrants.

Rees testified on direct examination that, if a person is visiting a resident of the James Cayce homes, the visitor must remain at the apartment where the resident lives or must be on the way there or back and not loitering on MDHA property. The visitor is expected to know the name of the person visited and that person's apartment number. According to Rees, MDHA wants the police to ask any visitors to identify who they plan to visit and for the police to try to connect the visitors and the residents, if possible. Because most crime problems in the James Cayce homes are caused by

3

persons who do not live there, MDHA authorizes the police department to enforce trespassing violations on MDHA property to create a safe environment for the residents.

Rees admitted on cross-examination that a person who receives permission from a resident to visit that resident at his or her apartment is allowed to walk onto MDHA property to make the visit. He further admitted that such a person visiting a resident with permission would not be trespassing on MDHA property if a police officer happened to see the person walking on MDHA property on the way to the visit. Rees also conceded that there is nothing in MDHA's written trespassing policy that requires a visitor to identify the resident to be visited or to provide the person's name or apartment number to a Metro police officer. Rees admitted, too, that if a person is found on MDHA's property without reason, the person should be warned to leave pursuant to MDHA's written criminal trespassing policy. On questioning by the Court, Rees testified that Metro police officers abide by their own departmental codes and that police policies supersede MDHA policies as far as trespassing is concerned.

When he is on duty, Sgt. Whitley makes it a point to stop and talk to individuals around the MDHA properties, if they are willing to speak to him, in order to familiarize himself with persons in the area. The police department routinely issues state misdemeanor citations to individuals who trespass on MDHA property. An individual does not qualify to receive a misdemeanor citation if a check of the criminal records database shows the individual missed court two or more times or if the individual has one or more outstanding warrants.

On November 28, 2006, at approximately 4:00 p.m., Sgt. Whitley and the flex unit officers were concentrating on MDHA's James Cayce homes and the surrounding vicinity. The police department had received many reports of robberies with weapons and drug-related shootings around the South Sixth Street Sylvan area off of Shelby and South Seventh Streets in Nashville. The most recent shooting had occurred within the prior week. The flex unit was not looking for any particular robbery or shooting suspect, and had only a vague description of a "young male black." (Suppression Hr'g Tr. at 79.)

4

Alone in his marked patrol car, Sgt. Whitley turned down the alley that runs between South Sixth and South Seventh behind the James Cayce homes. (Pl. Ex. 1; Def. Ex. 1 at 3.) Sgt. Whitley turned off South Seventh and traveled towards South Sixth in the alley, which runs parallel to and between Sylvan Street and Shelby Street. The alley was one of MDHA's "hot spots" for criminal drug activity. Sgt. Whitley had personally observed shootings in the alley, and there were three known drug houses along the alley where hand-to-hand drug sales occurred, with individuals coming from all over and driving down the alley to buy drugs. (Id. at 89-90.) Sgt. Whitley believed at the time that the entire alley was MDHA's private property, but he later learned, and conceded at the suppression hearing, that the paved portion of the alley was not MDHA property. (Id. at 60.)

According to Rees, the paved alley is city-owned property and MDHA does not have authority to prosecute trespassing in the alley. (Def. Ex. 1 at 6.) The alley is city property up to the point where the MDHA sidewalk and concrete abutment start on one side of the alley and up to the grassy area that exists on the other side of the alley. (Pl. Ex. 2.) The alley is used by persons who walk and drive through James Cayce homes. There is enough room for a person who is walking in the alley to pass by a car driving through the alley. Apartment buildings along this alley bear "no trespassing" signs that face out to the alley, but according to Rees, those "no trespassing" signs do not apply to the city alley.

As Sgt. Whitley turned into the alley, he saw an individual, whom he later identified as Defendant Maine, walking alone in the alley traveling toward him from South Sixth to South Seventh from the direction of the CeeBee grocery store on South Sixth. When Sgt. Whitley first turned into the alley, Maine was walking in the paved alley parallel to a dumpster sitting on MDHA property, carrying a plastic grocery bag, and not paying Sgt. Whitley "a bit of attention." (Pl. Ex. 1, Suppression Hr'g Tr. at 92.) The Court finds that, when Maine spotted Sgt. Whitley, he crossed over the concrete curb and continued walking in the grass on the MDHA property parallel to the curb approximately forty (40) yards toward Sgt. Whitley. (Pl. Ex. 1.) Maine did not look at Sgt. Whitley or make eye contact with him; he just kept walking. (Suppression Hr'g Tr. at 92.) Sgt.

5

Whitley did not pass Maine in his patrol car, but if he had, there would have been enough room in the alley for Maine to walk by the patrol car without stepping over the curb into the grassy area of the MDHA property. (Id.) As Maine walked down the alley, he passed five or six "no trespassing" signs posted on the MDHA buildings.

Sgt. Whitley wanted to talk to Maine, whom he did not recognize and had not seen before their encounter. Sgt. Whitley parked the patrol car, stepped out, shut the door, and walked across the curb onto the grass of MDHA property toward Maine. (Pl. Ex. 1, marked with "x".) No evidence was presented that Sgt. Whitley was dressed in police uniform. The Court finds, however, that Sgt. Whitley alighted from a marked patrol car, and Maine immediately recognized that Sgt. Whitley was a Metropolitan Nashville police officer.

Sgt. Whitley did not tell Maine to stop walking. As he approached, Sgt. Whitley said to Maine, "Hey, do you mind talking to me," or "Hey, can I talk to you for just a minute," or "Can I holler at you for just a minute." (Suppression Hr'g Tr. at 45, 47, 80.) Maine appeared to be very surprised when Sgt. Whitley stopped his patrol car, and Maine responded, "Yeah, what's going on?" (Id. at 47, 93.) The Court finds that Maine was very nervous and excited, as reported by Sgt. Whitley, and Maine placed his grocery bag down on the ground and stepped away from the bag and Sgt. Whitley. Ordinarily, the fact that someone in a high crime neighborhood would be carrying a plastic grocery bag, standing alone, would not concern Sgt. Whitley. (Id. at 81.) Maine's behavior in setting the grocery bag down and moving backward made Sgt. Whitley nervous because he thought Maine's action was "a little odd." (Id. at 47.) Sgt. Whitley could see that Maine had some beer in the bag, but that did not concern him. Sgt. Whitley thought Maine might have something to hide from him, and Sgt. Whitley wanted to prepare for anything that might happen.

Sgt. Whitley asked Maine if he lived there, and Maine told him, "no." Sgt. Whitley explained that there had been a lot of activity going on in the area and he wanted to talk to Maine to see what he was up to. Sgt. Whitley then asked for Maine's identification. Maine presented his identification, but the address on it was not located in the James Cayce homes or in that area. Sgt.

6

Whitley asked Maine where he lived, and Maine told him. (<u>Id.</u> at 81.) Sgt. Whitley put Maine's identification in his own back pocket. (<u>Id.</u> at 55.)

Sgt. Whitley asked Maine what he was doing there and if he was visiting someone. Maine answered that he was there visiting a friend. Sgt. Whitley asked Maine for the friend's name and address. The Court finds that Maine did not provide either piece of information. Maine just pointed in the general direction of South Seventh and South Eighth Street toward MDHA property. Sgt. Whitley asked Maine more than once for the address he was visiting, but Maine only pointed in the same direction and said, "over there." (<u>Id.</u> at 51.) Maine continued to show nervousness during his encounter with Sgt. Whitley; the officer described Maine as "fidgety." (<u>Id.</u> at 84.)

Once Sgt. Whitley learned that Maine did not live on the MDHA property and Maine could not give any information about who he might be visiting, Sgt. Whitley determined that Maine had committed the crime of trespassing on MDHA property. In Sgt. Whitley's experience, people usually know the names of the persons they are visiting, and in Sgt. Whitley's opinion, Maine did not have a legitimate reason for being where he was at the time.

Maine was wearing a coat and it was cold outside. Maine had his hand in the pocket of his coat. Sgt. Whitley told Maine to take his hand out of his pocket, and Maine complied. (<u>Id.</u> at 94.)

Sgt. Whitley asked Maine, "Is there anything on you I need to know about, do you have any weapons on you?" Maine's exact words were, "No, but you cannot pat me down." (<u>Id.</u> at 52.) Maine took another step back as he spoke. Maine was very adamant that Sgt. Whitley not pat him down. (<u>Id.</u> at 85.) Sgt. Whitley was concerned for his own safety, considering he was alone in a high crime area that he was familiar with and there had been recent robberies with weapons, as well as shootings in the area. Sgt. Whitley was very concerned Maine might have a weapon. In his experience, Sgt. Whitley asks a lot of people if they have anything on them, like weapons, that he should be concerned about, and although he does not necessarily expect them to tell the truth, he judges their facial expressions and body language to try to see how they are going to react in order to judge his own safety. Maine had given Sgt. Whitley some indicators, through his body language,

7

facial expressions, taking steps away from Sgt. Whitley, and putting his grocery bag down, that he might be armed and trying to hide a weapon. (Id. at 52, 83.) Maine was also nervous and wanting to know what was going on, like maybe he thought Sgt. Whitley knew something that Sgt. Whitley did not know. (Id. at 52.)

Sgt. Whitley made the decision to take Maine into custody; he did not warn Maine that he was trespassing on MDHA property and that he should leave. (Id. at 52, 86.) Sgt. Whitley explained to Maine that he was being handcuffed and arrested for criminal trespassing. As Sgt. Whitley was placing the handcuffs, he told Maine, "Hey, look I'm going to go home tonight, I don't want you to do anything stupid, I can always take these handcuffs off of you." (Id. at 53.) He also told Maine, "Hey, you don't have a legitimate reason for being out here, you are unable to tell me who you are visiting, where you are going. Right now you are being detained, don't do anything stupid. I'm going to put handcuffs on you for your safety and my safety, and I can always take them off, just don't do anything stupid." (Id.) Sgt. Whitley was "really concerned" that Maine was "fixing to do something stupid" such as push off of Sgt. Whitley, assault him, run, or pull out a weapon. (Id. at 53-54.) Sgt. Whitley slipped behind Maine, and Maine allowed Sgt. Whitley to handcuff him. Maine did not dispute in any way Sgt. Whitley's statement that Maine was trespassing or provide a name of the person he was visiting. (Id. at 54, 88.) Sgt. Whitley had not had an opportunity to check Maine's criminal record because he was not comfortable under the circumstances allowing Maine to stand in the area undetained while Sgt. Whitley walked back to his patrol car to run the records check. Sgt. Whitley handcuffed Maine both as incident to the arrest for criminal trespassing and to secure Sgt. Whitley's safety. (Id. at 76, 93-94.)

After placing Maine in handcuffs, Sgt. Whitley patted Maine down and found in Maine's back right jeans pocket a stainless steel, silver revolver loaded with hollow point bullets. Sgt. Whitley did not call for backup, but another officer eventually arrived to help with the arrest. Although Maine was in custody, he was not given his Miranda rights before he was asked questions on a gun questionnaire. (Id. at 116-117.) The other officer asked Maine where he bought the gun,

8

and Maine responded that he bought it off the street. The weapon was determined to be stolen. (Id. at 143.)

No evidence was presented that Sgt. Whitley checked the MDHA "banned" list provided to the police department to see if Maine's name was on the list. No evidence was presented that Maine was on the MDHA banned persons list. To Rees' knowledge, no one had ever warned Defendant Maine to stay off of MDHA property.

Sgt. Whitley checked Maine's criminal record and located two outstanding warrants for his arrest based on separate incidents. Maine had also missed court or failed to be booked two or more times. In Sgt. Whitley's opinion, he could not have written a citation to Maine for criminal trespass because of the outstanding warrants against Maine and Maine's history of failing to appear. Sgt. Whitley did not know at the time of the arrest that Maine was a convicted felon, but he soon learned that Maine had been convicted of armed robbery in Michigan. Maine had also been previously convicted of fleeing from a police officer.

During cross-examination, Sgt. Whitley acknowledged that the phrase "walking down an alley" would mean that the person was on the pavement, and he conceded that the paved alley was not MDHA property, (id. at 60), although at the time of the arrest he believed the paved alley was MDHA property. Sgt. Whitley also acknowledged that, on December 5, 2006, he completed a supplemental police report, the only report he completed in the case, which stated that he observed Maine "walking down the alley." (Id. at 73.) Sgt. Whitley did not write in his report that Maine walked over the curb down into the grass at the James Cayce homes.

Sgt. Whitley wrote the supplemental report at the request of Detective Joe Batey, who gathered the paperwork, including the Project Safe Neighborhood gun questionnaire, to evaluate the case for federal prosecution. (Id. at 99, 139.) Detective Batey considered the incident reports, the affidavits of complaint, arrest reports, officer supplements and his interview with Sgt. Whitley, and documented his findings and conclusions in a report dated and timed January 16, 2007 at 3:16 p.m. (Id. at 140-143; Pl. Ex. 5 (for identification only).) Detective Batey testified his report indicated that

9

the "defendant was carrying a plastic grocery bag walking in the grass area walking toward Sergeant Whitley." Detective Batey obtained this information from his interview with Sgt. Whitley, which was conducted just before Detective Batey filed the January 16, 2007 report. (Id. at 145.) Detective Batey also noted Sgt. Whitley's supplemental report stated that Defendant Maine put his grocery bag down on the "ground"; Detective Batey thought this was significant because it did not say "pavement," "roadway," or "alleyway." (Id. at 153.) At the time he prepared his January 16, 2007 report, Detective Batey knew it was important whether Maine was on MDHA property or whether he was on the public alleyway. (Id. at 147.)

Sgt. Whitley further agreed during his cross-examination that, within ten (10) days of Maine's arrest, on December 7, 2006, he testified at a state preliminary hearing on the criminal trespassing charge against Maine. Sgt. Whitley testified at that hearing: "I was traveling in my patrol car down the alleyway of Sylvan Street between South Seventh and South Sixth Street, and I observed Mr. Maine walking from South Sixth Street down the alleyway, and he was carrying a grocery bag." (Id. at 64.) Sgt. Whitley did not testify in the state hearing that Maine stepped over the curb into the grassy area onto MDHA property, although Sgt. Whitley knew at the time of his testimony that Maine had done so. Sgt. Whitley explained the discrepancy between his state preliminary hearing testimony and his suppression hearing testimony in this case by pointing out the state prosecutor did not ask him the question whether Maine stepped off the alley pavement onto the MDHA grassy area, and Sgt. Whitley did not think it was necessary to specify that he had seen Maine step from the paved alley onto the MDHA grassy area. In Sgt. Whitley's mind, anywhere in the vicinity of the alley was "the alley." (Id. at 68.) Had he known that the paved alley was not actually MDHA property, he would have been more specific when testifying at the state hearing about the location where he observed Maine . (Id. at 75.) Sgt. Whitley also knew at the time of the preliminary hearing that the case might be prosecuted federally due to Maine's status as a convicted felon in possession of a firearm. (Id. at 99.)

In the summer of 2007, after the state preliminary hearing in December 2006, after the case was indicted federally, and after Maine filed the instant motion to suppress, Sgt. Whitley learned that the paved alley is not MDHA property, but that everything beyond the curb is MDHA property. (Id. at 96, 114.) Sgt. Whitley returned to the scene with John Harrell, Special Agent of the Bureau of Alcohol, Tobacco, Firearms and Explosives, and former Assistant United States Attorney Brad Shepard to show them where the incident with Maine took place. According to Special Agent Harrell, Sgt. Whitley told him "over and over and over again" that Maine was in the grassy area on MDHA property when he was arrested. (Id. at 125.) Special Agent Harrell took photographs, which were introduced at the suppression hearing as Plaintiff's Exhibits 1-4. (Id. at 115.) Assistant United States Attorney Brad Shepard wondered if the alleyway was itself part of MDHA property. (Id.) In talking that day with Rees of MDHA, the group learned that the paved alley was not MDHA property. (Id. at 97, 113-114.)

Sytria Elliot testified that she has lived since September 26, 2006, at apartment 832-A South Eighth Court, which is located on MDHA property in the James Cayce homes. In November 2006, she and Maine had been involved in a one- or two-month romantic relationship. On November 28, 2006, Elliot contacted Maine and asked him to pick her up at the Greyhound Bus Station in Nashville where she arrived from Chattanooga. Maine picked her up by taxi cab and they went to her apartment in the James Cayce homes. Maine and Elliot visited at the apartment for about one hour when Maine said he had to handle some business and he was going to the store. Elliot invited him to return to her apartment and she expected him to return. No one told her that she could not invite Maine to visit her in her apartment. She did not see him after that, however, because he was arrested. She learned the next morning that he was in jail. Their relationship ended at his arrest and she spoke to Maine once in the next year and a half when Maine asked her to speak with his attorney. On cross-examination Elliot admitted that she has several convictions for theft and several probation violations. She also testified that she told Maine her real name was Sytria, but she also may have told Maine that her nickname was "Tall."

11

Elliot's credibility is lacking due to her prior convictions for theft and probation violations. The Court seriously questions whether Elliot's testimony was designed to help Maine by showing that he had a resident's permission to be on MDHA property on the late afternoon of his arrest. Even giving Elliot the benefit of the doubt that her testimony was truthful, the Court finds that Elliot's testimony is consistent with Sgt. Whitley's version of events. If, as Elliot testified, Maine knew Elliot's name and the location of her apartment and Maine had a legitimate reason to be on MDHA property to visit Elliot on the late afternoon of November 28, 2006, Sgt. Whitley reasonably could have expected that Maine would share that information with him when Sgt. Whitley asked him his reason for being on MDHA property. Moreover, Elliot was not physically present when Maine was arrested, and she had no personal knowledge of what actually occurred at the arrest.

Maine testified that he walked down the public alleyway toward Sgt. Whitley and denied that he ever stepped over the concrete curb and into the grassy area onto MDHA property. (Id. at 163.) The Court expressly rejects Maine's testimony that he walked in the public alleyway and that he did not step over onto MDHA's grassy area. The Court previously credited the testimony of Sgt. Whitley that Maine did cross over the concrete curb and walked parallel to the paved alleyway approximately 40 yards in the grass.

Maine testified that Sgt. Whitley initially asked him, "May I talk to you for a minute," and Maine answered, "What for." (Id. at 160.) According to Maine, Sgt. Whitley then stepped out of his car and asked where Maine was going. Maine testified that he told Sgt. Whitley he was going over to a friend's house, he pointed toward Eighth Avenue, and he told Sgt. Whitley that "it's on 8th Avenue, that's where I was going was on 8th Avenue." (Id. at 160.) Maine further testified that, when Sgt. Whitley asked Maine who he was going to see, Maine said he was going to see a friend, Sytria, but he did not say he was going to apartment 832-A on Eighth Street because he did not know the apartment number. (Id. at 160, 167-168.) Defendant Maine also testified that he intended to return to Elliot's apartment after he went to the store, and he was on his way to her apartment when he was arrested in the alley. (Id. at 157-158.)

12

The Court expressly finds that Maine did not tell Sgt. Whitley the name of the friend he was visiting, Sytria, nor did he tell Sgt. Whitley that he had come from Sytria's apartment earlier, nor did he tell Sgt. Whitley that his final destination was on Eighth Street, even though Sgt. Whitley asked him for such information repeatedly. Maine admits he did not tell Sgt. Whitley the number of Elliot's apartment because he did not know it. As Sgt. Whitley testified, Maine stated only that he was visiting a friend and he pointed in a general direction of South Seventh and South Eighth Street toward MDHA property.

Maine testified that Sgt. Whitley then asked for an ID, so Maine placed his bag down on the pavement in the alley in order to retrieve his ID. (Id. at 163.) The Court does not accept this testimony and finds instead that Maine placed his bag on the ground before he was asked for his identification, as Sgt. Whitley described.

Maine further testified that Sgt. Whitley took the ID from Maine, looked at it, and said he was going to detain Maine. Sgt. Whitley asked if he could pat down Maine, and Maine asked him "what for." (Id. at 160.) Sgt. Whitley put the handcuffs on Maine and searched him. (Id. at 161.)

The Court also does not accept this testimony by Maine. The Court finds that Sgt. Whitley asked Maine, "Is there anything on you I need to know about, do you have any weapons on you?" and Maine answered, "No, but you cannot pat me down." As he spoke, Maine took another step back, and Maine was very adamant that Sgt. Whitley not pat him down.

The remainder of Maine's testimony is consistent with Sgt. Whitley's testimony. Maine testified that Sgt. Whitley told him he was trespassing, that Maine appeared to be nervous and Sgt. Whitley wanted to put handcuffs on Maine. (Id. at 161-162.) Maine denied that he ever reached into his back pocket or tried to fight the officer, but rather, tried to cooperate with him. (Id. at 162.)

Maine admitted that he had seen the clearly visible "no trespassing" signs on the MDHA buildings many times. (Id. at 170-171.) He thought, however, that he could walk onto MDHA property to visit someone if that person invited him to the home. (Id. at 171.) If Maine truly held

13

such a belief, he failed to share his understanding with Sgt. Whitley when he was asked to explain his presence on MDHA property.

Having observed the demeanor of the witnesses as they testified on the stand, the Court specifically credits the testimony of Sgt. Whitley over the testimony of Maine. The Defendant tried to make much of Sgt. Whitley's failure to testify at the state preliminary hearing or to write in his supplemental report that Maine crossed the concrete curb and walked in the grassy area of the MDHA property. Detective Batey's testimony confirms, however, that Sgt. Whitley told him during an interview on or before January 16, 2007, that Maine walked in the grassy area of the MDHA property and did not walk down the public alleyway. Therefore, the Court finds that Sgt. Whitley's testimony at the suppression hearing is consistent with the information he gave Detective Batey during the interview concerning whether this gun case should be prosecuted federally. In contrast, Maine is a multiply-convicted felon who provided self-serving testimony in an effort to avoid conviction in this case and a potentially lengthy sentence. Because much of Maine's testimony is consistent with Sgt. Whitley's testimony, the Court is convinced that the events occurred as Sgt. Whitley testified, and not as Maine testified. The Court finds that Maine heard Sgt. Whitley testify during the suppression hearing, and that Maine varied his testimony from Sgt. Whitley's prior testimony in ways that he thought would help his cause.

## II. CONCLUSIONS OF LAW

Defendant Maine contends: (1) Sgt. Whitley did not reasonably suspect that Maine was engaged in criminal activity when he initially seized Maine by retaining his driver's license; (2) Sgt. Whitley improperly conducted a Terry pat-down search without reasonable suspicion that Maine was armed and presently dangerous; and (3) Sgt. Whitley lacked probable cause to arrest Maine for criminal trespass or to search him incident to arrest. The Government takes the position that the initial encounter between Sgt. Whitley and Maine was consensual and then developed into a lawful arrest for criminal trespass based on probable cause, and Sgt. Whitley's discovery of the firearm in Maine's pocket was a lawful search incident to arrest.

14

In a post-hearing Order, the Court asked counsel for the parties to brief three questions: (1) Assuming Sgt. Whitley believed in good faith that the paved alley was owned by MDHA when he arrested Maine for criminal trespass, does it matter whether Maine was walking on a public paved alley or on the adjacent grassy area owned by MDHA which abuts the paved alley? (2) Did Sgt. Whitley have reasonable suspicion to temporarily seize Maine by placing him in handcuffs for a brief pat-down search? and (3) Did Sgt. Whitley have probable cause to arrest Maine for criminal trespass? The Court will begin with the Government's contention that Sgt. Whitley had probable cause to arrest Maine for criminal trespass.

The Court must examine the events leading up to the arrest and then decide whether the historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause. See Maryland v. Pringle, 540 U.S. 366, 371 (2003); Ornelas v. United States, 517 U.S. 690, 695 (1996); United States v. Watson, 423 U.S. 411, 424 (1976). The probable cause standard is a "practical, nontechnical conception'" responding to "'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoted case omitted). Probable cause is a fluid concept that turns on the assessment of probabilities in a particular factual context and is not "readily, or even usefully, reduced to a neat set of legal rules." Id. at 232.

Probable cause exists when the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information are sufficient to warrant a prudent man in believing that the defendant committed or was committing an offense. See United States v. Thomas, 11 F.3d 620, 627 (6th Cir. 1993). "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990).

Applying these authorities to the facts and circumstances of this case, the Court concludes that Sgt. Whitley had probable cause to arrest Maine for the misdemeanor offense of criminal trespassing which occurred in his presence. Tennessee's criminal trespass statute reads as follows:

15

**39-14-405. Criminal trespass. –** (a) A person commits criminal trespass who, knowing the person does not have the owner's effective consent to do so, enters or remains on property, or a portion thereof. Knowledge that the person did not have the owner's effective consent may be inferred where notice against entering or remaining is given by:

(1) Personal communication to the person by the owner or by someone with apparent authority to act for the owner;

(2) Fencing or other enclosure obviously designed to exclude intruders;

(3) Posting reasonably likely to come to the attention of intruders; or

(4) Posting the property, in accordance with the requirements of § 70-4-106(b)(1)(B)(ii) [pertaining to hunting on land].

(b) It is a defense to prosecution under this section that:

(1) The property was open to the public when the person entered and remained;

(2) The person's conduct did not substantially interfere with the owner's use of the property; and

(3) The person immediately left the premises upon request.

(c) For purposes of this section, "enter" means intrusion of the entire body.

(d) Criminal trespass is a Class C misdemeanor.

When Sgt. Whitley turned his marked patrol car into the alley behind the James Cayce homes, he saw Maine walking toward him on the paved alleyway near a dumpster. Upon seeing Sgt. Whitley, Maine stepped over the concrete curb onto the grassy area of the MDHA property and continuing walking on MDHA property for 40 yards toward Sgt. Whitley. As Maine walked in the grass, he passed at least five or six clearly visible "no trespassing" signs on the MDHA apartment buildings. Maine admitted during his testimony that he had seen the "no trespassing" signs on the MDHA property many times.

The initial encounter between Sgt. Whitley and Maine was consensual. Sgt. Whitley was permitted under the law to approach Maine and ask him questions without having any reasonable suspicion that Maine was involved in criminal activity. See United States v. Taylor, 956 F.2d 572, 575 (6th Cir. 1992) (observing law enforcement officer may lawfully approach a pedestrian, identify

16

himself as police officer and solicit conversation or request an interview); United States v. Peters, 194 F.3d 692, 698 (6ᵗʰ Cir. 1999) (same); United States v. Cooke, 915 F.2d 250, 251-252 (6ᵗʰ Cir. 1990) (same). As he approached, Sgt. Whitley said to Maine, "Hey, do you mind talking to me," or "Hey, can I talk to you for just a minute," or "Can I holler at you for just a minute." Although very surprised that Sgt. Whitley stopped his patrol car, Maine responded, "Yeah, what's going on?" Sgt. Whitley immediately noticed that Maine was very excited and nervous. Maine placed his plastic grocery bag containing beer on the ground and took a step back from the bag and Sgt. Whitley. Sgt. Whitley thought this behavior was a little odd.

Sgt. Whitley asked Maine if he lived there, and Maine said, "no." Sgt. Whitley explained to Maine that there had been a lot of activity in the area and he wanted to know what Maine was doing. Sgt. Whitley asked for Maine's identification. Sgt. Whitley's questions of Maine and his request to see identification were lawful actions because Sgt. Whitley did not convey a message to Maine that compliance with his requests was required. See Peters, 194 F.3d at 698 (citing Florida v. Bostick, 501 U.S. 429 (1991)).

Maine handed Sgt. Whitley his identification, which showed a home address that was not in the James Cayce homes or in the vicinity. Sgt. Whitley asked Maine where he lived, and Maine told him. At that point, Sgt. Whitley placed Maine's identification in his own back pocket.

Maine argues that he was seized at that moment because Sgt. Whitley's action in retaining his identification constricted his ability to continue on his way. See United States v. Jordan, 958 F.2d 1085, 1087-1088 (D.C. Cir. 1992) (holding police officer's retention of suspect's driver's license along with request to search suspect's bag conveyed definite message that suspect was not free to leave area by driving his car). Although other circuits have also held that a police officer's retention of a person's identification results in a seizure of that person, United States v. Cordell, 723 F.2d 1283, 1285 (7ᵗʰ Cir. 1983); United States v. Thompson, 712 F.2d 1356, 1359 (11ᵗʰ Cir. 1983); United States v. Lambert, 46 F.3d 1064, 1068 (10ᵗʰ Cir. 1995), yet other courts have held that retention of a citizen's identification is but one highly material factor to be considered under the

17

totality of the circumstances analysis and the officer's retention of the citizen's identification is not, standing alone, a dispositive factor. United States v. Weaver, 282 F.3d 302, 310 (4th Cir. 2002) (and authorities cited therein). That Sgt. Whitley placed Maine's identification card into his own pocket is but one factor the Court considers among many in determining at what point Maine was seized. See id. ("Weaver was a pedestrian and could have walked away from the encounter.")

After reviewing Maine's identification, Sgt. Whitley asked Maine what he was doing there and if he was visiting someone. Maine responded that he was there visiting a friend. Sgt. Whitley asked for the friend's name and address , but Maine did not provide the requested information. He just pointed in the general direction of South Seventh and South Eighth Streets toward MDHA property. Sgt. Whitley again asked for the address Maine was visiting, but he did not provide it and only pointed in the same direction and said, "over there."

Maine contends that he told Sgt. Whitley he was there to visit a friend and thus Sgt. Whitley knew Maine had a homeowner's permission to visit on MDHA property. Because Sgt. Whitley knew Maine had permission to be on the property, Sgt. Whitley lacked probable cause to arrest Maine for criminal trespass.

Sgt. Whitley was not required to believe Maine's story that he was there to visit a friend. Maine did not provide his friend's name or address when asked more than once. See Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988); Straub v. Kilgore, 100 Fed. Appx. 379, 384 (6th Cir. 2004). Maine admitted he did not give Sgt. Whitley the address because he did not know it. The Court must consider the totality of the circumstances at the time Sgt. Whitley acted and not in the light of 20/20 hindsight. Klein v. Long, 275 F.3d 544, 550 (6th Cir. 2001). Maine did not give Sgt. Whitley any reason to believe that he was lawfully on the MDHA property. When Sgt. Whitley put on the handcuffs and told Maine he was under arrest for criminal trespass because he could not give a legitimate reason for being on the property, Maine did not offer any dispute. If, as he claimed at the hearing, he knew Sytria Elliot's name and his intent was to return to her apartment with her permission, he could have provided such information to Sgt. Whitley, but he did not. Consequently,

18

Sgt. Whitley was left with no reasonable explanation of Maine's presence on MDHA property at dusk in a high crime area where robberies and shootings had been occurring.

Once Sgt. Whitley learned that Maine did not live on MDHA property and Maine could not give any information about who he was visiting, as an ordinary visitor would be expected to provide, Sgt. Whitley determined that Maine did not have a legitimate reason for being on MDHA property and that Maine had committed or was committing the crime of criminal trespass. The statute provides that a person commits criminal trespass if that person, "knowing the person does not have the owner's effective consent to do so, enters or remains on property, or a portion thereof." Tenn. Code Ann. § 39-14-405. The statute permitted Sgt. Whitley to infer that Maine knew he did not have MDHA consent to be on the property because the property was posted "no trespassing" in many places in a manner reasonably likely to come to the attention of intruders. Id. The Court concludes that Sgt. Whitley had probable cause to place Maine under arrest for criminal trespass and search him incident to that arrest, which search produced the loaded firearm in Maine's pocket. See Chimel v. California, 395 U.S. 752, 763 (1969). Maine was not seized before he was placed under arrest for criminal trespassing.

Maine contends that the lack of probable cause was clear given the affirmative defense in the statute. He claims that, if the facts were as Sgt. Whitely testified, Maine "took a step over on to MDHA property while continuing to walk toward the officer[.]" (Docket Entry No. 35, Supp. Br. at 3.) According to Maine, it was apparent that the grassy area was "open to the public" in the sense that anyone could simply step on to the property. (Id.) Maine claims he was not interfering with the owner's use of the property, and he was never given a warning or request to leave. (Id.)

The MDHA property was not "open to the public" as Maine suggests. Rather, it was posted in numerous places: "MDHA PROPERTY NO TRESPASSING" and in smaller letters below, "VIOLATORS WILL BE PROSECUTED." MDHA property was private property that was not open to the public. There is no evidence that Maine interfered with the owner's use of the property or that he was given a warning or asked to leave. But these matters would only be relevant to an

19

affirmative defense raised by Maine at trial as to whether he could be convicted of the trespassing charge. Sgt. Whitley was required only to have probable cause that Maine had violated the criminal trespass statute. See Gates, 462 U.S. at 244 n.13 ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."); United States v. Schaafsma, 318 F.3d 718, 722 (7th Cir. 2003) ("Although mere suspicion is not enough, probable cause 'need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.'"). Often, what may appear to be innocent behavior, when taken in light of all the circumstances, may form the grounds for probable cause. See United States v. Wright, 16 F.3d 1429, 1438 (6th Cir. 1994); United States v. Anderson, 923 F.2d 450, 456 (6th Cir. 1991). The Court concludes that Sgt. Whitley had probable cause for arrest and this was sufficient to justify the search of Maine's person incident to that arrest. See Anderson, 923 F.2d at 456 ("The test for the existence of probable cause is wholly objective. Probable cause exists when a 'man of reasonable caution' . . . would be warranted in the belief that the person arrested had or will commit a crime."); Wright, 16 F.3d at 1438 (holding officers had authority to search defendant's person incident to arrest).

Maine also contends that he should not have been arrested because he did not violate MDHA's trespassing policy. Rees testified, however, that MDHA's written trespassing policy was merely a guideline for Metropolitan Nashville police officers and that police officers abided by their own departmental codes and police policies, which supersede MDHA policies. The Court concludes that Sgt. Whitley was not required to follow only MDHA's written policy on criminal trespassing; Sgt. Whitley had authority to enforce the Tennessee statute on criminal trespassing, which contained different provisions than MDHA's written policy.

Because the Court finds that Maine stepped off of the paved portion of the alleyway and walked in the grassy area of MDHA property for a distance of 40 yards, it is not necessary for the Court to address whether Sgt. Whitley labored under a mistaken belief of fact or law that the paved alleyway was MDHA property.

Nor is it necessary for the Court to evaluate whether Maine was subjected to a lawful pat down under Terry v. Ohio, 392 U.S. 1, 30-31 (1968). Even if this latter question required resolution, the Court would conclude that Sgt. Whitley possessed a reasonable suspicion that Maine was armed and dangerous to justify placing handcuffs on him and searching him for weapons to ensure officer safety. In Terry, 392 U.S. at 24, the Supreme Court stated:

> [W]e cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

Sgt. Whitley was known to Maine as a police officer, and Sgt. Whitley was alone close to dusk in a high crime area where he had personally witnessed shootings and knew of recent prior robberies and shootings. Sgt. Whitley was entitled to draw fair inferences based on his years of experience as a police officer in gauging Maine's demeanor as expressed through his facial expressions, body language and other conduct. Cf. Reid v. Georgia, 448 U.S. 438, 441 (1980). Maine appeared to be very nervous throughout his encounter with Sgt. Whitley. Nervousness may be considered with other factors to determine if reasonable suspicion existed. United States v. Richardson, 385 F.3d 625, 630 (6th Cir. 2004). Maine's action in setting his grocery bag down on the ground and stepping back from it and the officer was odd. Maine had his hand in his coat pocket at one point and was asked to remove it, which he did. Maine could not give a legitimate explanation for his presence in the alley. When asked if he had anything on him that Sgt. Whitley should be concerned about, he answered, "No, but you cannot pat me down," and took another step back. It is important to note that Sgt. Whitley did not state he was about to conduct a pat down or a search. Cf. United States v. Harris, 192 F.3d 580, 583 (6th Cir. 1999) (explaining officer told suspect he was going to pat him down for weapons). Maine himself raised the issue of a pat down. Thus, while Sgt. Whitley could not rely on a suspect's refusal to give consent to a requested pat

down or search as heightening reasonable suspicion, United States v. Smith, 263 F.3d 571, 594 (6th Cir. 2001), Sgt. Whitley could evaluate Maine's denial that he had a weapon, as well as Maine's adamant, voluntary statement that Sgt. Whitley could not conduct a pat down, as pertinent factors in the totality of the circumstances to judge whether he should be concerned for his own safety.

Sgt. Whitley's concern that Maine was armed was not simply an inchoate and unparticularized suspicion or ill-defined hunch. Cortez, 449 U.S. at 417-418; United States v. Richardson, 385 F.3d 625, 630 (6th Cir. 2004). Sgt. Whitley testified that specific, articulable facts about Maine's demeanor and conduct caused him to feel unsafe leaving Maine alone uncuffed while he returned to his patrol car to run a criminal records check. See United States v. Knox, 839 F.2d 285, 289 (6th Cir. 1988) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981) for proposition that pattern of suspicious behavior need only be recognizable by one versed in field of law enforcement). The Court concludes that Sgt. Whitley lawfully determined that Maine might be armed and dangerous and that handcuffing Maine briefly for purposes of a pat down was appropriate under the totality of the circumstances.

The evidence is undisputed that the police officers at the scene did not give Maine his Miranda rights before asking questions about his possession of the firearm which elicited incriminating answers. Therefore, the Court concludes that any statements Maine made following his arrest for criminal trespassing about his possession of the firearm must be suppressed as violative of Miranda.

The Government stated in its original response to the suppression motion that Maine voluntarily asked Sgt. Whitley for a written citation for trespassing rather than to be arrested for the offense. The Government asserted Maine's statement was voluntarily made and not the product of custodial interrogation. No evidence about Maine's inquiry was presented at the suppression hearing. Therefore, the Court will not rule on the admissibility of this evidence at this time, but will reserve any ruling until such evidence is presented at trial.

22

## III.  CONCLUSION

For all of the reasons stated, Defendant's Motion to Suppress (Docket Entry No. 18), will be granted in part, denied in part, and reserved in part.  The motion will be granted in that any statements Maine made after his arrest about his possession of the firearm are not admissible in evidence because the police officers did not read Maine the <u>Miranda</u> rights before asking Maine questions to which he gave incriminating answers.  The Court reserves its ruling until trial on whether an alleged inquiry Maine made seeking a written citation for trespassing rather than an arrest is admissible as a voluntary statement not made during custodial interrogation.  This matter was not addressed at the suppression hearing.  The motion to suppress  is denied with regard to the firearm and ammunition found on Maine's person.  Sgt. Whitley had probable cause to arrest Maine for criminal trespassing and to search his person incident to arrest; thus, the firearm and ammunition are admissible in evidence at trial.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

23